

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DELBERT WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 00 C 8095 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge John A. Nordberg |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On April 6, 1998, around 7:30 in the evening, Delbert Watkins backed his truck up to the

dock at the Fox Valley postal distribution facility for his last delivery of the day. Watkins was a

contract truck driver who made three bulk mail deliveries to this facility every day, something he

had done for 6 years. After backing in his truck, Watkins walked into the facility and crossed the

dock floor to check in at the expediter's desk. This was the last act of his workday. The dock

floor was busy, as it always was at this time of the day with many trucks being unloaded, and

Watkins had to avoid a passing equipment container as he walked toward the pedestrian stairs

that led down from the dock floor to the ground level.

As he got to the top of the stairs, he was distracted momentarily and did not look as he

began to go down the stairs. As he stepped down, his foot gave way, and he fell head-first to the

bottom of the eight steps. His fall was broken by George Nilo, another contract driver, who

happened to be standing at the bottom of the stairs. Otherwise, plaintiff's head would have hit the metal door that led to the outside.

Dazed and unsure what had caused his fall, Watkins got up after a minute or two and looked up and saw a crumpled two-foot cardboard letter tray sitting on the steps. Although he was shaken up and had scraped his knees, he was able to drive home. Sometime later he realized that the fall had also injured his back. Believing that the post office was negligent for failing to keep these stairs clear from debris, Watkins filed a claim under the Federal Tort Claims Act, asserting a claim of negligence under Illinois law. A two-day bench trial was held on the issue of liability only. This opinion sets forth this Court's findings of fact and conclusions of law pursuant to Rule 52.[1]

## OVERVIEW OF ARGUMENTS

Although we will examine the parties' arguments in greater detail below, we begin with an overview to provide a conceptual framework for understanding the facts. The government makes three primary arguments.

First, the government claims that plaintiff has failed to show that there was *any* object on the stairs. This argument rests primarily on the government's generalized claim that large debris like a letter tray *never* fell to the dock floor because (i) the post office had essentially a perfect track record of cleaning up things and (ii) because the mail at this time of day was "containerized," meaning that any letter tray would have been sealed inside a shrink-wrapped

---

[1]Under Rule 52(a), a court is not required to describe and discuss every single fact mentioned by the parties so long as it discusses those subsidiary facts that reveal how it reached its decision. *See Trustmark Ins. Co. v. General Cologne Life*, 2004 WL 1745777, *1, n.1 (N.D. Ill. Aug. 2, 2004) ("Rule 52(a) only requires that courts make findings and conclusions sufficient to support the ultimate decision.").

pallet which would have been broken down only in the interior processing part of the facility. The government also argues that plaintiff's story of what happened is contradicted by the testimony of Nilo and is not corroborated by the post-accident investigation.

Second, the government argues that, even assuming there was a cardboard object on the stairs, the post office had neither actual nor constructive notice that it was there and thus cannot be held responsible for failing to remove it. Relying on the testimony of Nilo, the government suggests that the letter tray could have blown onto the steps just before plaintiff arrived.

Third, the government argues that, even assuming there was an object on the stairs and that the post office had notice of it, plaintiff should not recover either because the object was an open and obvious danger or alternatively because plaintiff was negligent in failing to watch where he was walking and in failing to use the handrails.

Plaintiff responds to these three main arguments as follows. First, he argues that there is ample proof that there was an object on the stairs. In addition to his own testimony, Nilo testified that plaintiff slipped on a cardboard object that had blown onto the stairs. Plaintiff also showed the letter tray to Ed Stubitsch the day after the accident. As for the post office investigation, plaintiff says that it was shoddy and did not even include a statement from Nilo who was the only eyewitness.

Second, plaintiff believes that he can establish notice under any one of three theories. He first argues that it is more likely than not that a postal employee created the condition in which case there is no need for notice. He next argues that, even if a contract driver caused the tray to fall to the ground, sufficient evidence exists to establish that it had been on the ground for a sufficient amount of time such that a postal employee should have seen it and picked it up. He

finally argues that the post office had constructive notice because it was generally aware that things fell to the floor on a regular basis.

Third, although plaintiff admits that he never saw the letter tray until after he fell, he says that he did not see it because he was distracted just as he got to the top of the stairs.

## SUMMARY OF BENCH TRIAL PROCEDURE

The bench trial took place over two days. Both parties were well represented by counsel. The court heard testimony from three witnesses – plaintiff and two post office employees (Thomas Holm and Derrick Brady). In addition, the parties submitted the deposition testimony of Nilo and two other postal employees (Ed Stubitsch and Clinton Davis). The parties submitted exhibits, which consisted of various exemplar pictures taken of the dock floor and stairs after the accident, a copy of the post office's housekeeping policy, and a copy of the accident investigation report.

After the evidence was presented, the government made an oral motion for judgment as a matter of law. Both sides presented brief oral arguments on that motion, which was taken under advisement, and then presented a longer closing argument thereafter.

The Court has reviewed the arguments of counsel, the testimony of the witnesses, the depositions of the absent witnesses, the exhibits received into evidence, the trial transcript, and detailed notes taken by the Court at trial. The Court has taken care to appraise each witness's credibility and to determine the weight to be accorded his or her testimony. In so doing, the Court considered the witnesses' intelligence, ability, and opportunity to observe; their age, memory, and manner while testifying; any interest, bias, or prejudice they may have had; and the reasonableness of their testimony in light of all the evidence presented in the case. The Court

-4-

recorded its impressions of the witnesses in its notes. In reaching its conclusion in this case, the Court has sought to draw reasonable inferences from the evidence, and has considered the parties' legal arguments.

## I.    UNDISPUTED FACTS.

With only a couple of exceptions, the historical facts are undisputed. They are set forth in this section. Where there is a dispute, we will summarize the relevant testimony and evidence. In Section II , we will resolve these disputed facts in conjunction with the relevant legal standard.

### The Fox Valley Facility

In 1998, Delbert Watkins was working as a truck driver for Eagle Express, a job which he had held for approximately six years. (Tr. 133.) In this job, he made three daily trips to and from the post office's Fox Valley Processing and Distribution Center located in Aurora, Illinois. These deliveries consisted of transporting mail from Fox Valley to smaller postal facilities located in places such as Oak Brook, Riverside, Brookfield, LaGrange, and Summit. (*Id.*)

The Fox Valley facility is a one-story building containing a long narrow loading dock that is approximately 40 feet wide by 400 feet long and that takes up one entire side of the building. The bulk of the rest of the facility is a larger internal processing area or workroom where the mail is taken after it is unloaded from the trucks. (Tr. 20, 33, 44.) The workroom is separated from the dock by a wall which has doors at various points.

The dock has 46 truck bays for loading and unloading. (Tr. 33.) Between every eighth or ninth truck bay, there is a pedestrian entryway that opens onto an eight-foot stairs that leads up to the dock floor. There are sturdy yellow pipe handrails running along both sides of these stairs.

They extend out a foot from the top and the bottom of the stairs. (Tr. 37; *see also* Exs. 1-A, 1-C, and 1-D.)

Opposite the pedestrian entryway door between bays 28 and 29, where this accident took place, is an expediter's table where contract drivers must check in after backing their truck into the dock. (Tr. 35.) This table is approximately 30 feet from the top of the stairs. (Tr. 37.) Most contract drivers leave the facility right after checking in with the expediter and do not usually hang around the dock. (Tr. 124.)

The dock is well lit with 400-watt high pressure sodium bulbs positioned approximately 18 feet apart. (Tr. 35.) One of these bulbs was located two feet from these particular stairs, and it is undisputed that it created "plenty of light" on these stairs. (Tr. 37; Stubitsch Dep. Tr. 39.)

At the Fox Valley facility, there are 3 work shifts, sometimes referred to as tours. (Tr. 24-25.) Watkins made his deliveries during the third tour, which was from approximately 3:00 p.m. until around 11:00 or 11:30 p.m. (Tr. 25.) His first trip from Fox Valley was around 3:00 o'clock in the afternoon. For his second trip, he would return to Fox Valley around 5:00 o'clock and leave soon thereafter. He arrived for his final run at around 7:30 or 7:35. (Tr. 122.)

This general time period – from between 6:30 p.m. and 8:00 p.m – was the busiest time on Tour 3 and is sometimes referred to as the "rush hour." (Tr. 26, 75, 97.) This is because the mail has to be in by 8:00 p.m. in order for it to be processed that night, a deadline that contract drivers like Watkins were well aware of. (Tr. 75.)

All witnesses agreed that the dock was a busy place during rush hour. In the area of the dock known as the point, which is the area between Dock Bays 20 and 28 where most of the a activity was taking place at this time, there were six mail handlers, two general expediters, and at

least one spotters (or MVS driver) who would pull truck trailers up to the dock and away from the dock when they are empty. (Tr. 98, 105, 122.) Postal employees would use various motorized tugs and forklifts, which create noise and commotion. (Tr. 127-28.) The mail is moved in hampers or in tubs that are inside of all purpose containers, which are referred to as APCs. (Tr. 42.) Both hampers and APCs are enclosed on four sides. (Tr. 42.) It was a policy of the post office that only postal employees could load and unload the trucks. (Tr. 80; Stubitsch Dep. 23-24; Davis Dep. 11-12.) If a contract driver attempted to unload a truck, a postal employee would tell him to stop. (Tr. 80.) Occasionally, however, a contract driver might unload his truck. (Tr. 93.)[2]

During this busy period, as the postal workers unloaded the trucks, they would take the containers with mail through the double doors and would also push the empty equipment down the dock. (Tr. 138.) Plaintiff testified that the equipment would be "thrown down" to the right "just like a bowling ball in a bowling alley." (Tr. 138, 157.) The postal workers would use forklifts and hand dollies to unload the trucks and would hook up the various containers (such as APCs) in a row "like a little train" and would haul them toward one end of the dock. (Tr. 139.)

## The Cleaning Policy

The post office has a written policy governing housekeeping at the facility. (Tr. 21.) This policy states, among other things, that the post office should conduct frequent and regular inspections and that large pieces of trash and empty boxes on the dock should be picked up. (Tr.

---

[2]Derrick Brady specifically testified that he did occasionally see plaintiff trying to unload his truck. (Tr. 122.) But Brady said that this would have happened at 3:00 p.m. (when Watkins would have been making his first trip to Fox Valley) because there are no mail handlers around at this time to load his truck. (*Id.*)

27-28; Ex. 5 at 39.) Employees are aware that it is important to keep the aisleways and stairways clear from debris and that any material, such as a cardboard letter tray on the stairs, would be a tripping hazard. (Tr. 22.) Moreover, employees know that if they saw an object such as a cardboard letter tray on the stairs, they should pick it up and remove it.

There are two routes – a cleaning route that includes sweeping and mopping as a regular task and a policing route that consists of emptying the trash cans, spot sweeping, and policing the area for large items of trash. (Tr. 26-27, 39.) During the rush hour on Tour 3, one person was specifically assigned to police the dock area. This person would traverse the dock, going back and forth several times. (Tr. 40.) Holm testified that the custodian on the policing route would police the area for, among other things, "large [] items that might be determined [to be] trash." (Tr. 39.)

### How Much Debris Typically Accumulated On The Dock Floor?

One issue that occupied much time at trial was generally how clean the post office kept the dock floor. Each side tried to portray a different picture, with the government suggesting that the dock was spick and span and plaintiff suggesting it was messy and cluttered.

The two postal workers who testified at trial – Thomas Holm and Derrick Brady – made strong categorical statements that debris never fell to the floor or, if it did, it consisted only of small items like shrink wrap and would not have included something as large as a 2-foot letter tray. For example, when asked whether debris might "occasionally" fall to the ground and need to be picked up during the busy time of Tour 3, Brady gave an unqualified "no." (Tr. 81; *see also* Tr. 120-21.) Likewise, Holm made similar statements, asserting that in he has *never* seen debris

on the dock floor. (Tr. 44-45.) He also said that no one has ever complained to him about debris being on the dock floor or stairs. (Tr. 53.)

Brady and Holm testified that there was a good reason why this never happened; namely, all incoming mail during the rush hour is "containerized," meaning that it is transported in larger, confined containers such as a pallet enclosed with shrink-wrap. (Tr. 47.) Loose mail, according to these two witnesses, was not loaded or unloaded on the dock floor. (Tr. 92.)

Despite these categorical statements, these two post office witnesses, along with Ed Stubitsch, conceded at other points in their testimony that there were at least some occasional lapses in this seemingly perfect record. For example, when questioned by plaintiff's counsel, Holm conceded that "at times" cardboard boxes and other debris falls to the ground (Tr. 29), that "there were occasions where debris would accumulate" during Tour 3 (Tr. 31), that sometimes the dock gets too busy and workers don't stop to pick up debris that might be lying about (Tr. 59), and that management had complained occasionally about the housekeeping in the facility (Tr. 31).

As for the "containerized" argument, Holm admitted that letter trays sometimes come in on pallets, in which case they were not containerized. (Tr. 54.) He also conceded that a hamper might be overloaded and break down and have to be unloaded and that this could conceivably take place on the dock.[3] (Tr. 57.) He also said that it sometimes gets too busy for workers to pick up debris as soon as they notice it and that it sometimes is only picked up later when things slow down. (Tr. 59.)

_____

[3]But Holm thought that it was more likely that the debris would be smaller pieces of paper, such as shrink wrap and strapping material, rather than large debris. (Tr. 58.)

Holm further agreed that postal employees sometimes use letter trays for their personal needs, such as for carrying personal items. (Tr. 54-55.) Although Holm had never seen an employee using a letter tray as an ashtray during a smoking break, he said that it "wouldn't surprise" him if an employee had used a letter tray for this purpose. (Tr. 54-55.)

Similarly, Brady, when asked on cross whether he had seen any shrink wrap or banding material on the dock, stated that sometimes skids or pallets would have to be broken down on the dock when they were going to offices that did not have a forklift. (Tr. 96, 129.) In such cases, a postal worker would have to take the shrink wrap, banding, and skid covers off, and then get rid of the skid because it would not be put on the truck. (Tr. 129.) Brady said that this breaking down of the skids typically occurred on the outbound phase of the operations and that the last outbound trip was a little bit after 5:00 o'clock. Afterwards, everybody on the dock went to lunch from around 5:30 until 6:00 o'clock so that when they came back all they had to do was the inbound trucks. (Tr. 100-01). Brady also testified that there are garbage cans located throughout the dock. (Tr. 96.)

In addition to these concessions by Holm and Brady, Ed Stubitsch, who was the manager of distribution operations at the Fox Valley Facility, testified about various cleaning lapses that sometimes occurred. Stubitsch specifically testified that contract drivers would occasionally raise the issue of either housekeeping or debris in the aisleways; that things get pretty busy at certain times of the day; and that debris can accumulate such that his employees sometimes

-10-

"don't get to it in time." (Dep. Tr. 18-19.)[4] Stubitsch said that employees sometimes used trays

for personal uses, noting that he had "seen a lot of stuff in them." (*Id.* at 26.)

Stubitsch also testified that, during his periodic walk-throughs of the facility, he

sometimes noticed that debris had fallen to the floor and not been picked up. (*Id.* at 30.)

Stubitsch suggested that these periodic lapses could be attributed to the varying degree of

diligence among the employees:

> We have some employees that are very high – very capable employees, and we
> have some less-than-marginal employees. And I think we would be more inclined
> [to see debris] if the less-than-marginal employee is on hand, that's more inclined
> to happen, you know, not giving a rip instead of taking care of business.

(*Id.* at 31.)

Stubitsch's assessment – that some debris did fall to the floor and that the housekeeping

wasn't perfect – was also confirmed by both plaintiff and Nilo. Plaintiff testified that he saw

debris "quite often" on the dock floor. (Tr. 149.) When asked in his deposition to estimate how

often, he said approximately 10 times a year over his six years of going to the Fox Valley facility.

(Tr. 171.) He saw shrink wrap on the floor from when employees would rip it off a skid at the

last minute before putting it onto a trailer. (*Id.*) He said that employees sometimes would stack

letter trays five or six high in hamper and that they sometimes fell out when, for example, the

---

[4]When asked whether it is possible during a busy time that mail handlers might have a
letter tray fall off a load and then might "just kick it aside for a moment until they are finished
with what they are doing," Stubitsch answered: "I have never really seen that, but human nature
is human nature." (*Id.* at 29.)

hamper went over a little hump. (Tr. 150.) He also saw employees use letter trays for personal

purposes. He explained:

> [T]he girls like to take [letter trays] and set them on the stairwells at break times,
> and they break down the one side there and the other two sides out here and they
> sit on them during breaks out there, where they'll drink their pops and – used to
> smoke cigarettes there, but I don't think they can smoke in there no more.

(Tr. 150.)[5] Plaintiff also said that he saw letter trays resting on the stairwells "quite frequently."

(*Id.*)

Nilo testified that he sometimes complained about the messiness of the dock area and that

nothing was really ever done in response to his complaints. (Dep. Tr. 10.) "[I would] mention it

to somebody there at the facility, and they just, yeah, okay, get somebody on it, but nothing was

ever done." (*Id.*)

### Letter Trays And Skid Lids

Letter trays come in two colors (white plastic and brown cardboard) and two sizes (a two

foot regular size and a one-foot half-size). (Tr. 118.) The turned-up sides of both types of trays

are four inches deep. (Tr. 128.) As for the cardboard letter trays, one witness (Holm) stated that

he had never seen a letter tray the color of the dock floor. (Tr. 49.) However, when asked

whether he had a seen a letter tray that was dirty enough to look like the dock floor, he said:

"Close, but no." (*Id.*)

After this accident, Holm took a flattened up letter tray and tried to rest it on the stairs.

He testified that it was not easy to do because the letter tray "has to be perfectly all the way up

---

[5]Exhibit 1-P, which was offered by the government for a different purpose, shows debris
on the ground outside the pedestrian door between bays 28 and 29. Specifically, there are a
number of cigarette butts strewn about the ground, suggesting that this area in fact is often used
by postal employees on their breaks.

against the rise of the stair." (Tr. 50.) The tray did not cover the full step it was on and extended out over half of the next step. According to Holm, this letter tray would be "quite obvious" to anyone approaching the stairs. (*Id.*)[6]

## **April 6, 1998**

Plaintiff arrived at the facility for his third run around 7:30 in the evening during the busy period of Tour 3. (Tr. 142.) He does not remember which doorway he went in. (Tr. 140.) He came in and up to the dock, unlocked his trailer, raised the overhead door, and then checked in first at the registered mail desk and then at the expediter's desk. (Tr. 141.) During this time, the mail handlers were presumably unloading his truck. (*Id.*) Plaintiff testified that he did not unload his truck nor did he see any other contract driver who was loading or unloading his truck at this time. (Tr. 152.) Other than Nilo, no one saw any contract driver standing nearby.

Plaintiff described the dock as being "quite congested," although he said that this congestion was the same amount as it had been during the last six years he had been coming to Fox Valley. (Tr. 142, 153.) Nilo largely confirmed plaintiff's view of the messiness of the dock on the night in question. Although Nilo at first stated in his deposition that the condition of the dock "wasn't bad" just prior to the accident (Dep. Tr. 10), he later made clear that the dock was far from clean on this particular night. Specifically, he testified that the post office had not done a good job of cleaning up the dock floor, that skid lids "were blowing all over that day," that there was plastic "all over," and that it was "just really messy that day." (*Id.* at 15, 21.) None of

---

[6]Holm said that it was even harder to get a skid lid on the steps because its dimensions are approximately 37 inches by 44 inches. (Tr. 51.) Because of its even larger size, Holm stated that it would be "very obvious" to someone approaching the stairs from across the dock platform. (Tr. 52.)

-13-

the post office witnesses had any specific recollections about how clean the dock was on this particular day.

After handing the keys to the expediter, who was located directly across the from the stairs between dock bays 28 and 29, plaintiff proceeded to leave the facility by going across the dock floor, down the stairs, and out the pedestrian door. He said that he was not in a hurry to get out of the facility: "I take my time. No, I wasn't in no hurry." (Tr. 173.) Plaintiff was also aware, based having previously seen debris on the floor, that he had to be "very careful" and specifically that he "would have to look" when going down the stairs to "see if there [were] any pop cans or anything left down there." (Tr. 154.)

When he attempted to cross the dock floor, some empty equipment containers were passing by, and plaintiff had to "weave in and out" of them as if he were trying to cross a "three railroad track crossing":

> [A postal employee driving a tug] was zooming by with a load of APCs, about ten, I guess it was, nine, but they were only supposed to pull three at a time. Any container – they like to string it out, and then you make a dash in between there and there's another one coming by. So, you know, it's kind of like at a three railroad track crossing you're trying to go across with everybody coming at you.

(Tr. 144-45.)

After getting across the dock floor, plaintiff approached the stairs. He described his approach at several points in his testimony. At one point, he testified that "[all I saw was George [Nilo] down at the bottom of the stairs [] and then something caught my eye over here and I put a step down. [] And then it just like fell away, like there was no stair there[.]" (Tr. 146.) At another point, he testified: "And when I first got to the stairs I seen George Nilo, and I heard something to my right and I looked, and as I stepped down it was gone." (Tr. 145.) On cross-

-14-

examination, he again described his approach, this time in the context of being asked why he failed to see the letter tray sitting on the stairs. His answer: "Probably because I was distracted." (Tr. 163). When asked to explain why he was distracted, plaintiff testified: "Because a tow just went by with a whole bunch of [APCs], and as I was getting ready to make my approach to the stairwell, I heard noise to my right, George Nilo was talking down here, and I went to make my step[.]" (Tr. 164.)

As he stepped down to the first step below the level of the dock floor, his foot gave way and plaintiff "just fell forward." (*Id.*) "As I was coming down I was also, like, you know, reaching out for the railing, and when I did, I was gone[.]" (*Id.*) He fell all the way to the bottom of the stairs with his knees hitting the floor first and then his palms. (*Id.*) His head was touching Nilo's pant leg. (*Id.*)

After the fall, plaintiff was disoriented and dazed and says he blacked out for awhile. (Tr. 148.) Nilo asked him whether he was alright and plaintiff said "I think I am." (Tr. 165.) When he got up, he looked back up the stairs and saw the letter tray "laying partially down" on the stairs. (Tr. 148.) He said that it had dark spots and tire tracks on it, suggesting that it had been run over by a forklift or tow truck. One side was "broken down flat" and the other side was "kind of squashed out." (*Id.*) It was a two-foot letter tray. (Tr. 149.) Plaintiff did not report the accident to anyone at this time because he was "pretty embarrassed about falling down a flight of stairs." (Tr. 166.)

In his deposition, which was taken almost five years after the accident, Nilo largely confirmed plaintiff's version of what happened, although his account differs in one respect.[7] Nilo came in and also went to the expediter's desk, probably a short time before plaintiff did. As he left the expediter's desk, he saw a piece of cardboard to the side and stepped over it. (*Id.* at 19.) This piece of cardboard was then blown towards the stairs by wind that was created from an open door. (*Id.*)

Nilo went down the stairs. At that time, there was no object on the stairs, but Nilo saw the same piece of cardboard "to the side," meaning that it presumably had blown from near the expediter's desk to the edge of the stairs. (*Id..*) Nilo was standing at the bottom of the stairs talking a "few minutes" to a mail handler who was loading his truck. (*Id.* at 23, 29.) Then as Nilo was turning to leave, he saw plaintiff approaching the stairs through his peripheral vision. He also saw that the cardboard object was on the stairs. (*Id.* at 24.) He wanted to warn plaintiff to watch out, but for some reason did not say anything. Nilo said he thought it would be hard to miss the skid lid because it was "pretty big." (*Id.*) When asked whether he would have noticed a skid lid on the stairs, Nilo said he "probably would have." (*Id.* at 23.)

According to Nilo, plaintiff began to step down and then "all of a sudden [] he was coming down." (*Id.* at 11, 14.) According to Nilo, plaintiff was reaching for the railings as he was falling. (*Id.* at 14.) Plaintiff fell into Nilo and pushed him against the door. (*Id.*) Plaintiff was on "all fours" with his hands on the ground. (*Id.*) Nilo testified that, if plaintiff hadn't fallen

---

[7]Nilo knew Watkins "just through work" in a professional relationship. They were not personal friends but "would say hello to each other when we were there at the facility." (Dep. Tr. 9.)

into him, he would have "gone out the door" and "been seriously hurt." (*Id.* at 11.) Nilo described the moments after the fall as follows:

> Then he stood up, tried to stand up. I said, "Take it easy," you know. It looked like he was a little dazed. And I said, "You okay?" And he just shook it off and then he stood up and that was it. He went to the door, and he went out.

(*Id.* at 11.)

Nilo said that a piece of cardboard had fallen down from the step and was off to the side and was "all crumbled up." (*Id.* at 15.) Nilo identified the object as a "flat piece of cardboard" that was crumpled at the "ends." (*Id.* at 15, 18.)

### Plaintiff's Activities After The Accident

After waiting a moment to get oriented, plaintiff walked out the door to his truck and then waited there a long time but eventually pulled his truck away from the facility because he believed that the post office did not want trucks sitting there empty. (Tr. 166-67.) He was able to drive home successfully. (Tr. 167.)

The next morning he called his supervisors at Eagle Express and told them that he had fallen down a flight of stairs at the post office. (Tr. 168.) He told them he was hurting and in a great deal of pain but still agreed to work that day because he knew that his employer had no extra drivers available and would be upset. (*Id.*) When asked why he drove despite his pain, he testified: "I had to. I have a family to feed." (*Id.*) Plaintiff stated that he went to work on the hope that the pain would go away without him having to seek medical treatment. (Tr. 176-77.)

Later that morning, at around 10:00 o'clock, plaintiff returned to the post office for his first run of the day and saw what he believed was the same letter tray lying at the bottom of the

stairs. (Tr. 151.)[8] Plaintiff showed it to a supervisor who was standing nearby. (Tr. 151-52.) He

went to report the accident to management but was told that he would have to wait until 2:00 or

3:00 in the afternoon. (Tr. 169.) He ran his normal truck routes that day.

Plaintiff eventually talked to Stubitsch, presumably later in the day on April 7th.[9]

Stubitsch described this conversation in his deposition:

> I was walking on the dock by the stairway where he fell, and he had a piece of
> postal equipment in his hand. And to the best of my knowledge, it was a half tray,
> but, you know, again, this is almost five years ago, so I – and he was agitated, and
> he was telling me that he had fallen. And, again, to the best of my knowledge, it
> was several days ago is what he said. But, you know, again, that's – I asked if he
> was hurt.
>
> He said, "Yes," and rolled up his pant leg and showed me a spot on his knee – I
> don't know if it was [his] left or right knee – about the size of a quarter, a red spot. I
> asked him if he needed medical attention, and he said no, he was going to go to his doctor
> tomorrow on his own.
>
> * * *
>
> In the course of the conversation, he called George Nilo over. [H] e had Mr. Nilo
> verify that he had fell[.]

_____

[8]Later in his testimony, plaintiff testified that he "presumed" that it was the same letter
tray that he had slipped on and could not be "certain" that it was. (Tr. 169-70.) The government
points to this testimony to cast doubt on whether this was actually the same letter tray. But either
way, whether it was the same or a different one, hurts the government's position because it has
claimed that it was be a near impossibility for *any* letter tray to be sitting on or near the steps.
Moreover, we find that plaintiff's willingness to admit that he was not entirely certain if it was
the same tray adds credibility to his testimony and undermines the government's claim that he
was continually "making up stories" to make his case sound better.

[9]Stubitsch was unsure of exactly when this conversation took place but said that it took
place soon after the accident, from one to four days afterwards. (Dep. Tr. 43.) Given that
Watkins testified that he talked to a supervisor one day after the accident and showed him a letter
tray and given that Stubitsch testified that Watkins showed him a letter tray, it is most likely that
the two men are referring to the same conversation and that it took place one day after the
accident.

(*Id.* at 32-33, 34-35.)

During or shortly after this conversation, Stubitsch asked Clint Davis "to investigate what Mr. Watkins was telling me and to be sure he did a thorough investigation." (Dep. Tr. 33.) Davis says that he eventually did conduct an investigation, although his memory is murky and it is not clear when he conducted the investigation.

### Plaintiff Files A Claim Form

On April 11, 1998, five days after the accident, plaintiff filled out a one-page claim form entitled "Claim For Damage, Injury, Or Death" (OMB No. 1105-0008).[10] On this form, plaintiff stated that the accident took place at 7:35 p.m. and that George Nilo was a witness. He described the accident as follows:

> Walking down stairs at Fox Valley dock area going to my vehicle where there was an empty cardboard letter tray left on 2nd step. Unknowingly I stepped on the tray and fell down approx[imately] 7 or 6 steps landing on both hands and knees. I left not knowing of the bleeding until I arrived home.

(Gov. Ex. 2.)[11] This claim form, written by plaintiff, does not describe Nilo's recollections of the accident.

### The Accident Investigation Report

In July, approximately three months after the accident, the post office filled out a form entitled "Accident Investigation Worksheet." The report describes the accident as follows:

> Eagle Express contract driver Delbert Watkins claims that he fell down the steps on the dock. (Located between Bays 28 and 29.) He claims that this took place on

---

[10]There are actually two forms with the same date and they are almost identical with no substantive differences.

[11]In this form, he also described his injuries: "scraped skin off both knees causing minor bleeding resulting in discomfort to left hip joint & lower back."

04/06/98 at about 19:35. He stated that there was a cardboard tray on the step that caused him to slip and fall, resulting in bruises on both knees.

(Pls. Ex. 6, p.2.) The report is dated is dated July 10, 1998, and was signed under the space

marked "Investigator" by Brady. Although Brady testified that he did sign the report, he said that

he did no investigation and did not fill out any of the report. (Tr. 83.)[12]

On November 29, 1999, approximately a year and a half after the accident, plaintiff

submitted the same form. This time it was typed, rather than handwritten, and was thus

presumably drafted by his lawyer. This one describes the accident in roughly the same terms:

> I was moving from the dock area at the Fox Valley Mail facility to my truck.
> There was debris on the stairs leading down from the loading dock including an
> empty cardboard tray. I did not see that tray until after I fell. I fell about 6 or 7
> steps after slipping on the cardboard.

(Gov. Ex. 2.)

## II. DISPUTED FINDINGS OF FACT AND CONCLUSIONS OF LAW.

We now address the three central disputed questions in this case.

### A. Was there some object on the stairs that caused plaintiff to fall?

The government argues that plaintiff was "just making up stories, whatever he thinks will

help him" (Tr. 207) and that he has not proved that there was any object on the stairs. It relies on

general inferences about housekeeping and points to several inconsistencies that supposedly cast

doubt on plaintiff's assertion that there was an object on the stairs. For the reasons set forth

below, we find that plaintiff in fact did slip and fall on a cardboard object that was on the stairs.

---

[12]Stubitsch never received a copy of the written report. He believes that Davis sent it to the district level. (Dep. Tr. 33.)

First, plaintiff's testimony at trial about how he fell was generally credible and believable. Moreover, this testimony was consistent with what plaintiff had been saying since the day after the accident when he told Stubitsch he slipped on a cardboard letter tray. Five days after the accident, he filed the first claim form in which he again said that he fell on an "empty cardboard letter tray left on 2nd step." Three months after the accident, the post office prepared the accident investigation report which indicates that plaintiff was claiming that "there was a cardboard tray on the step that caused him to slip and fall." A year and a half after the accident, plaintiff submitted a second claim form that again described the accident in the same terms.

Second, the only eyewitness to the accident confirmed the essential details of plaintiff's testimony. Nilo testified that plaintiff slipped on a cardboard object located at the top of the stairs; that plaintiff fell suddenly (a description that is very similar to plaintiff's); that plaintiff was reaching for the railing *as* he was falling (again matching plaintiff's testimony); that plaintiff came head-first into Nilo's body; that plaintiff ended up on all fours; and that plaintiff was dazed for a minute or so and struggled to stand up after the fall. Thus, contrary to the government's assertion in closing argument that Nilo's testimony is the "exact opposite" of plaintiff's testimony (Tr. 202), Nilo's testimony in fact corroborates plaintiff's testimony on every key point except one.[13]

The two men did differ on whether the object on the stairs was a two-foot letter tray (plaintiff) or was a skid lid (Nilo). The government believes that this one discrepancy is so

---

[13]There is no evidence that Nilo was biased in plaintiff's favor. Although they were both contract truck drivers, they worked for different companies, and neither considered the other a personal friend. Moreover, Nilo was on good terms with the postal service employees as well. Davis and Brady both testified that they liked Nilo and talked to him on a regular basis. Nilo thus was essentially a neutral witness who had no obvious motive to favor either side.

fundamental that it casts doubt on plaintiff's entire story. We disagree. To begin with, this discrepancy is not significant. Both men described a cardboard object of roughly the same size. Both men described it as worn and crumpled. Nilo said that the object was "crumpled on the edges" (Tr. 18); plaintiff said that one side of the letter tray was "broken down flat" and the other side was "squashed out." (Tr. 148.) Plaintiff's testimony that the letter tray was flattened out on the ends would make it look much like a skid lid. This discrepancy is thus minor and whichever version we adopt would lead to the same result as discussed below.[14]

To the extent that we need to resolve this difference, the solution is not to throw out plaintiff's entire testimony but simply to decide whether the object – after all, they both agree there was an object – was a skid lid or a letter tray. Having weighed all the evidence, we find that plaintiff's testimony is more likely true. Plaintiff indicated object was a letter tray the day after the accident when he talked to Stubitsch. In contrast, Nilo first described the object in his deposition taken more than five years after the accident.[15] Moreover, in reading Nilo's deposition testimony, he seemed unsure as to what the exact object was, at one point wrongly describing it as a gaylord (an impossibility given its much larger size) and finally settling on the description of it as a skid lid after some prompting by the government's attorney. The fact that

---

[14]A third possibility exists as well. Stubitsch testified that plaintiff approached him the day after the accident and showed him a one-foot (rather than a two-foot) letter tray. Stubitsch, whose deposition was taken in the same general time frame as Nilo's, candidly noted that he could not be entirely confident about his recollections: "to the best of my knowledge, it was a half tray, but, you know, again, this is almost five years ago." (Dep. Tr. 32.)

[15]In closing argument, the government suggested that Nilo was not confused or mistaken because his testimony had been preserved on plaintiff's first claim form filed five days after the accident. (Tr. 205.) This argument fails because, although the claim form listed Nilo as a witness, it did not describe his testimony.

-22-

Nilo described the object as crumpled on the edges would be more consistent with a letter tray, which has upturned edges, than with a skid lid which is flat already and not as likely to be described as having crumpled ends.

Third, Stubitsch also corroborated part of plaintiff's story. Although Stubitsch was not present at the time of the accident, he talked to plaintiff the next day. Stubitsch heard plaintiff describe how he fell; he saw the letter tray plaintiff was holding; and he saw a red spot on plaintiff's knee. Stubitsch did not give any indication at the time that plaintiff's story was – as the government now argues – inconceivable due to the post office's perfect cleaning record.

Fourth, contrary to the government's assertions, no other witness contradicted plaintiff's and Nilo's description of the accident. In its opening argument, the government argued that Derrick Brady was in his office directly across the dock floor from these stairs at the time of the accident, with a "full view," and that he did not hear anyone yelling. (Tr. 15.) In closing, the government argued that the 10 other postal employees in the area never saw or heard anything. (Tr. 206.) These arguments are unpersuasive. Brady was in a glass-enclosed office 30 feet away with a window that was blocked in substantial part by work-related posters. (Tr. 73, 78; Ex. 1-C.) Moreover, it was a busy time of the day with noise, commotion, and motorized vehicles going by. It is thus not surprising that Brady heard no yelling. In any event, this argument is a red herring because neither plaintiff nor Nilo ever testified that plaintiff yelled as he fell.

Fifth, we disagree strongly with the government's argument that plaintiff's testimony is doubtful because the investigation report did not "corroborate *in any way* what Mr. Watkins says happened." (Tr. 17, emphasis added; *see also* Tr. 206.) The only evidence cited in the report is plaintiff's statement of the accident which, as we've already said, is completely consistent with

-23-

his current testimony. There is nothing else in the report, much less anything that contradicts plaintiff's testimony. This is true even though the it was standard practice of the post office was to write on the form (in the space provided) any facts that were different from, or contradicted what the injured person stated. (Tr. 87.)

To the extent that the report fails to corroborate plaintiff's story, this was certainly not his fault. He did not prepare the report. If anything, this report casts a negative light on the post office. As an initial matter, we do not even have a clear picture of exactly how the report was prepared. Stubitsch says that, when plaintiff told him about the accident, he called over Clint Davis and told him to "investigate what Mr. Watkins was telling me and to be sure he did a thorough investigation." (Dep. Tr. 33.) Davis said he did investigate, but he could not remember whether he prepared a report. (Dep. Tr. 30.) Brady testified that someone (he doesn't remember who) brought the report to him and that he signed it in the box entitled "Investigator" even though he never did any investigation of the accident. The report contains pictures but Davis said he did not take them and we do not know who did.

Putting aside the murkiness of how the report was prepared, it is clear that it was not thorough. It failed to list Nilo as an eyewitness. It also did not mention the 10 other employees working in the vicinity, nor Brady sitting in his office at the time, nor plaintiff's conversation with Stubitsch the day after the accident. The failure to get a statement from Nilo – the only eyewitness – is the most glaring omission. It is hard to believe that the post office was unaware that Nilo was an eyewitness. When Stubitsch asked Davis to investigate, he had just talked to both plaintiff and Nilo. Five days after the accident, plaintiff filed a claim form in which he listed Nilo as a witness. Nilo was at the facility on a regular basis and was known by everyone.

Davis, the person who did the investigation and who also most likely prepared the report, talked to Nilo "all the time" and the two men would "joke and kid around about different things." (Dep. Tr. 36.) In fact, Davis even remembered talking to Nilo about the accident. (Dep. Tr. 35.) Despite the fact that Nilo was sticking out like a virtual sore thumb, the post office did not list him as a witness. We cannot say whether this failure was due to something more than simple sloppiness in preparing the report, but we can say with confidence that any failure to provide corroboration cannot be blamed on plaintiff.

Sixth and finally, the government's main argument – that the post office had a near-perfect record in keeping the dock free from any debris and that all mail was "containerized" – likewise fails to undermine the direct observations of Nilo and plaintiff.

As described in Section I, the post office witnesses all conceded, when pressed on specific questioning, that debris did occasionally fall to the floor. Stubitsch stated that he sometimes saw debris on the floor when he walked through the facility. Holm said that things sometimes got too busy and that employees would not be able to pick up debris immediately. (Tr. 59.) Everyone agreed that employees sometimes used letter trays for personal uses. Stubitsch said that some employees were less than diligent in picking things up when they got busy. Sometimes pallets had to be broken down on the dock.

This conclusion accords with common sense and other evidence. As plaintiff's counsel persuasively argued in closing, "common sense tells us when you have this many trucks coming in and out, when you have this many people unloading and loading these trucks in a very short timeframe [,] things are going to fall to the ground." (Tr. 189.) Moreover, the fact that the post office specifically required that one person police the dock floor during rush hour for loose debris

suggests that it was not inconceivable that debris occasionally might fall to the floor. The existence of trash cans at various points along the dock adds to this inference.

At best, the government's cleanliness argument is merely a general inference about the likely overall state of the dock during this general time period and must give way to specific testimony about the state of the dock on the night in question. The question at issue here is not whether there was debris constantly on the dock floor, a question about which we make no finding, but simply whether it is more likely than not that there was one piece of debris on the stairs between bays 28 and 29 at around 7:30 on April 6, 1998. As noted above, both Nilo and plaintiff provided credible testimony that there was some object on the stairs on this particular night.

## B.    How Did The Letter Tray Get On The Steps?

The finding that some object was on the stairs means that it had to get there somehow. But exactly how? This question is relevant to the notice issue, which the parties previously addressed in their summary judgment briefs. To summarize, under the Illinois Local Government Tort Immunity Act, the government may not be held liable unless it received notice of the defective condition. 745 ILCS 10/3-102(a); *see Stewart v. United States*, 918 F.Supp. 224, 226 (N.D. Ill. 1996). Notice may be actual or constructive. *Rose v. United States*, 929 F.Supp. 305, 308 (N.D. Ill. 1996). Constructive notice is established where the condition has existed for a length of time or was so conspicuous that authorities exercising reasonable care and diligence would have known about it. *Stewart*, 918 F.Supp. at 227. However, "a plaintiff does not need to prove actual or constructive notice when she can show the substance was placed on the premises

-26-

through the defendant's negligence." *Reed v. Wal-Mart Stores, Inc.*, 700 N.E.2d 212, 214 (Ill. App. Ct. 1998).[16]

This legal standard requires us to really only address two questions. First, who caused the tray to fall to the floor? If it was a postal employee, then notice is present under *Reed* because the post office would have affirmatively created the condition. Second, if it was a contract driver, then we must determine whether it was on the floor long enough so that the post office could have seen it and picked it up.

Even after this trial, it is unclear exactly how the object originally got on the dock floor In these types of situations, which have arisen often in slip and fall cases, Illinois courts have held that a plaintiff need only meet the following two-part test in order to show that the defendant created the hazard:

> To prove that the defendant business, as opposed to a third person, created the hazard (and therefore whether actual notice by the defendant is required), Illinois courts have required the plaintiff to 1) show that the foreign material was related to the defendant's business, and 2) produce some evidence that makes it more likely than not that the defendant was responsible for its existence.

*Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 707 (7th Cir. 1999).

Applying this test here, we find that it is more likely that a post office employee, rather than a contract driver or some other third party, created this condition. First, there can be no dispute that the object – whether it was a 2-foot letter tray (plaintiff), a 1-foot letter tray (Stubitsch), or a skid lid (Nilo) – related to the business of the post office.

---

[16]*See also Bernal v. City of Hoopeston*, 718 N.E.2d 229, 233 (Ill. App. Ct. 1999) ("Inasmuch as Illinois courts have consistently held the Act is a mere codification of the common law but does not abrogate all common-law duties, we find no reason to reject the common-law exception to the notice requirement where the city affirmatively creates a dangerous condition.") (citations omitted).

Second, plaintiff has produced more than enough evidence to show that it was more likely than not that the post office was responsible for the object. The post office had a policy that only postal employees were to load and unload trucks. On the night in question, ten postal employees working in the vicinity. There is no evidence that any other contract drivers, other than plaintiff and Nilo, were nearby. Postal employees worked throughout the day in the facility whereas contract drivers merely dropped off their loads, checked in with the expediter, and left.

As noted above, a number of possible scenarios could have caused the tray to end up on the floor. Almost all of them involved a postal worker and not a contract driver. In particular, given that both plaintiff and Nilo said the object was crumpled and given that plaintiff testified that it had a tire mark on it, one likely possibility is that the tray was at some point run over by a motorized vehicle such as a fork lift. If so, then again it is much more likely to have been a postal employee, who should have then stopped and picked up the tray, rather than a contract driver who was not permitted to operate such vehicles. Finally, we do not really need to add up all these inferences because Stubitsch, the manager of the facility, directly stated in his deposition that, if a letter tray in fact fell to the floor during processing, it would be fair to conclude that it was caused by a postal employee rather than a contract driver. (Dep. Tr. at 28.) In sum, it is more likely that a postal worker caused the letter tray to fall to the dock floor, and notice is therefore established under *Reed* regardless of how long the object was on the floor.

But even if a contract driver somehow dropped the tray, we would still find notice present given that Nilo testified that the object was on the floor for at least several minutes and that it moved from near the expediter's desk to over by the steps. During this time, ten employees were

-28-

working in the area and the lighting was good. This was not a small object. Nilo was able to see it out of his peripheral vision. Someone should have noticed it and picked it up.[17]

## C.  Why didn't plaintiff avoid the letter tray?

We turn to the final issue of whether, and to what extent, plaintiff was at fault for the accident. The government argues that plaintiff should not recover anything because plaintiff did not look where he was going and did not use the handrail as he went down the stairs. The government relies on both the "open and obvious" doctrine and the doctrine of contributory negligence.

At trial, the government generally lumped these two doctrines together and treated them as functionally the same thing.[18] Although they are similar, they are not the same thing. *See generally Hacek v. United States*, 178 F.3d 481, 485 (7th Cir. 1999). In particular, the "open and obvious" doctrine applies to hazards that "are so perspicuous that their mere existence is an adequate warning and thus discharges the landowner's duty of care." *Id.* at 483. In other words, if a danger is open and obvious, then the landowner has no duty and is not required to "foresee and protect against injuries from" these potentially dangerous conditions. *Prostran v. City of Chicago*, 811 N.E.2d 364, 368 (Ill. App. Ct. 2004).

---

[17]The government's suggestion in closing argument that letter tray "could have been [on the steps] for two seconds" (Tr. 204) misconceives the issue. It is true that Nilo said the object blew onto the steps just seconds before plaintiff descended. But he also said that it had been on the floor for more than a few minutes and was first seen near the expediter's desk. The government therefore must explain why no one saw it during this earlier period.

[18]Neither side discussed these legal standards at trial, nor did they cite to any cases on point.

-29-

Based on this description of the open and obvious danger doctrine, we conclude that the issue of plaintiff's fault in this case is more properly evaluated under principles of contributory negligence. If we were to conclude that the letter tray was an "open and obvious" danger, we would then be saying in effect that the post office had no duty to remove the letter tray and could have chosen to leave it sitting on the steps knowing that it was so obvious that no one would ever trip over it. This position, however, is not consistent with the understanding of the postal witnesses, all of whom agreed that the post office had a duty to keep the stairs free from debris and that a letter tray on the stairs "would definitely be a possible tripping hazard" and would be unsafe. *See* Tr. 22 (Holm); Tr. 85 (Brady); Dep. Tr. 41 (Stubitsch). The government reaffirmed this point in closing argument, stating that the "postal service absolutely had a duty to maintain the stairs and the dock. We have never denied that. We take it seriously and we do think it's everyone's job." (Tr. 211.) For this reason, we find that the appropriate doctrine to address plaintiff's possible fault is contributory negligence.

In assessing plaintiff's negligence, we believe that it is clear that plaintiff was at fault to *some* degree. It is undisputed that he never saw the tray at all as he approached the stairs or as he stepped down to the first step and instead saw it for the first time only *after* he had fallen. This means that he was not looking as he walked down the stairs. Based on a careful reading of his and Nilo's testimony, we also find that he also did not use the handrails as he *began* to go down the stairs and only reached out for them *as* he began to fall, at which point it was too late to do any good. A reasonable person should look when going down the stairs. This point is confirmed by plaintiff's own testimony. He testified that he normally would always check the stairs before going down to be sure nothing was there. (Tr. 154: "You would have to [look down] – you

-30-

would have to look, see if there was any pop cans or anything left down there."). Plaintiff's habit of checking the stairs also accords with common experience as most reasonable people would need to glance down at least to gauge where to put your foot so as to not overstep. At a minimum, such a person would use the handrails if he was not looking where he went. Plaintiff did neither and thus is at fault to some degree.

Plaintiff did not dispute this point at trial and effectively conceded that he was not looking where he was walking and that he should have been paying more attention. (Tr. 192: "he did have an obligation to be on the look-out for his own safety.") This case thus does not involve a situation where plaintiff was paying attention but still did not see the letter tray in time to avoid it because, for example, it was hard to see. Rather than arguing that he could not see the letter tray for some reason, plaintiff offers a different justification – namely, that he was distracted. (Tr. 163-64.) In closing, plaintiff's counsel admitted that plaintiff "didn't pay as much attention as he would have liked," but argued that this was because he was "distracted by that noise." (Tr. 192.)

Is plaintiff's "distraction" explanation a valid excuse? As an initial matter, plaintiff did not cite to any cases to support such a theory. In any event, we do not believe that the reasons given by plaintiff are the kind of excuses that would absolve plaintiff from exercising care in going down the stairs.

Let us look closer at exactly what the alleged distraction was. Plaintiff's explanation for why he was distracted was not especially clear nor specific. He appears to be claiming that there were two or perhaps even three different distractions. At one point in his testimony, he suggested that he was distracted by the difficulty of getting across the dock floor in what he described as the

"three railroad track crossing." (Tr. 164.) In closing, plaintiff's counsel echoed this theme when he stated that the dock floor was a "very congested and busy place" and that plaintiff's "main concern at that point in time was getting through and around the driver of the tugs to get to the exit." (Tr. 192.)

Plaintiff also testified that, as he got to the top of the stairs, he was distracted by something he either heard or saw. *See* Tr. 145 ("I heard something to my right"); Tr. 146 ("something caught my eye"). He described the distraction as "a noise." It is possible – though not entirely clear from his testimony – that the noise was from the motorized vehicle that was going by as he crossed the dock floor. (*See* Tr. 192.) Beyond referring to the distraction as a noise, plaintiff did not further describe it. Plaintiff finally also suggested that he was distracted by Nilo who was talking at the bottom of the stairs. (Tr. 164.) These explanations at a minimum are vague and patchwork.

Even taken in their best light, they do not mitigate plaintiff's fault. Plaintiff admitted that the noise and commotion this particular night was nothing special or unusual and therefore would have been the same noise and commotion he would have encountered hundreds of times before. The fact that plaintiff cannot even remember what the noise was also suggests that it was not something unusual. To extent that plaintiff was distracted by Nilo's conversation, this clearly would not be a valid excuse, not only because it could hardly be called a hard-to-resist distraction, but also because Nilo was standing at the bottom of the stairs and would have drawn plaintiff's gaze in the proper direction. Plaintiff's suggestion that he was worried about the passing vehicle, one which he suggested was being driven in an unsafe and fast manner, might conceivably provide some excuse if plaintiff had fallen while *crossing* the dock floor. Once he

-32-

reached the top of the steps, however, he could not have been worried about these vehicles anymore.

Even if there was some atypically loud noise or commotion that suddenly grabbed plaintiff's attention, which again there is no evidence to suggest there was, then why didn't plaintiff simply stop and pause? He said that he was not in any hurry to get out of the building. When he checked in with the expediter, he had completed his workday. He has not offered any reason why he needed to quickly move down the stairs. As noted above, he was aware that he had to be careful going down the stairs. In sum, as the government persuasively stated in closing: "A reasonable person would have stopped, looked and then walked." (Tr. 201.) We agree. Plaintiff's apparent decision to walk down the stairs while looking backward, without using the handrail *before* he stepped down, was clearly not a reasonable one.

The final and also most difficult issue, then, is to determine the specific percentage of fault of plaintiff and the post office. The government argues that plaintiff was more than 50% at fault, meaning that plaintiff would recover nothing. Plaintiff appears to admit that he might be partially at fault but has not gone so far as to offer a percentage amount for his fault. Neither side cited to any cases to guide the Court in assessing this issue, and it is not an issue that can be resolved under any clear formula. As noted above, we believe that plaintiff's failure to look before going down the stairs was a significant factor in this accident. At the same time, we also believe that the letter tray on the stairs was an unsafe condition, something that government itself concedes is true. Based on these and all of the other facts set forth above and at trial, and based also on this Court's many years of experience, we find that the post office was more at fault (55%) than plaintiff (45%) for this accident.

## **CONCLUSION**

The government's motion for judgment as a matter of law is denied. This Court hereby enters a finding that the government is 55% and the plaintiff is 45% at fault for this accident. The parties are directed to appear at a status hearing on April 28, 2005 at 2:30 p.m. to discuss how to resolve the remaining issue of damages so that we may bring this case to a conclusion.

**ENTER:**

*John A. Nordberg*

**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** *March 10, 2005*